**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. MICHELLE GRANT<br><br>STATE OF GEORGIA<br>ex rel. MICHELLE GRANT<br><br>Plaintiff-Relator,<br><br>v.<br><br>NAVICENT HEALTH, INC.; THE MEDICAL<br>CENTER OF CENTRAL GEORGIA, INC.;<br>ATRIUM HEALTH, INC.; AND NAVICENT<br>HEALTH PHYSICIAN GROUP,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. __5:20-CV-57__
**JURY TRIAL DEMANDED**
**FILED UNDER SEAL**

## COMPLAINT

1.     Relator Michelle Grant, brings this action on behalf of herself, the United States of America, and the State of Georgia against defendants Navicent Health, Inc.; The Medical Center of Central Georgia, Inc.; Atrium Health, Inc.; and Navicent Health Physician Group (collectively "Navicent") for violations of the federal False Claims Act ("federal FCA"), 31 U.S.C. §§ 3729 *et seq.*, and Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168.1 *et seq.* (collectively, the "False Claims Act").

2.     First, Navicent routinely falsely bills for inpatient services performed by midlevel providers as if they were performed by a physician under a

split/shared rule where (a) the claim is submitted to Georgia Medicaid (which does not recognize the split/shared rule); (b) the claim is for critical care services (which Medicare does not reimburse under the split/shared rule); and (c) the Navicent physician does not perform substantive services so as to qualify for billing under the split/shared rule.

3.      Second, Navicent submits claims for critical care services when the patient records give no indication that critical care services were actually provided or medically necessary (e.g., because the patient was in stable condition).

4.      Third, certain Navicent outpatient providers use templates for their visit notes, but fail to customize the individual notes to reflect what actually occurred, resulting in chronic overbilling of E/M codes.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b), and 28 U.S.C. §§ 1331, 1345.

6.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as one or more of the defendants resides or transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## PARTIES

7.      Defendant Navicent Health, Inc. has a principal address of 691 Cherry

Street, Suite 700, Macon, GA 31201.

8.      Defendant The Medical Center of Central Georgia, Inc. also has a principal address of 691 Cherry Street, Suite 700, Macon, GA 31201.

9.      The Medical Center of Central Georgia ("MCCG"), also known as the Medical Center Navicent Health, is owned and operated by Navicent. It is a 637-bed hospital located in Macon, Georgia. Its physical address is 777 Hemlock St., Macon, GA 31201.

10.     As of January 1, 2019, pursuant to a strategic combination of the two entities, a subsidiary of Atrium Health is the sole member of Navicent Health.

11.     Defendant Atrium Health, Inc. has a principal address of 1000 Blythe Boulevard, Charlotte, NC 28203.

12.     Relator Michelle Grant was employed by Navicent Health Physician Group ("NHPG"), a subsidiary of Navicent, as its Coding Integrity Manager from June 2018 thru June 2019.

13.     Relator is a certified coder and AHIMA-approved ICD-10 trainer. Relator's background includes 14 years as a compliance auditor for LifeBridge Health/Sinai Hospital in Baltimore, MD.

14.     Relator had access to Navicent's billing records and patient records and has firsthand knowledge of the allegations raised herein.

## GOVERNMENT HEALTHCARE PROGRAMS

15.     Title XVIII of the Social Security Act, U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicine and Medicaid Services ("CMS").

16.     The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient care, medical supplies, and laboratory services. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

17.     Reimbursement for Medicare Part A claims is made by the United States through CMS. Hospitals submit Medicare Part A claims directly to CMS, which in turn makes a standard, bundled payment based on a DRG diagnostic code.

18.     Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual").

19.     Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

20.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes the Medicaid program, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

21.     TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were

ordered to active duty for thirty (30) days or longer. The program is
administered by the Department of Defense and funded by the federal
government.

22.     The Civilian Health and Medical Program of the Department of Veterans
Affairs ("CHAMPVA") is a comprehensive health care program in which the
Veterans Health Administration shares the cost of covered health care services
and supplies with eligible beneficiaries, including spouses and children of
veterans who have or had a service-connected disability. The VA also provides
medical benefits through the Patient-Centered Community Care ("PC3") and
Veterans Choice Program ("VCP").

23.     The Federal Employees Health Benefits Program ("FEHBP") provides
healthcare benefits for qualified federal employees and their dependents. Under
the FEHBP, the federal employee is covered by private payer health insurance
which is in turn subsidized in part by the federal government.

24.     The Office of Workers' Compensation Programs ("OWCP") of the U.S.
Department of Labor ("DOL") administers federal workers' compensation
programs under four statutes: (1) the Federal Employees' Compensation Act
("FECA"), 5 U.S.C. §§ 8101 *et seq.*; (2) the Longshore and Harbor Workers'
Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq.*; (3) the Federal Black
Lung Benefits Act ("FBLBA"), 30 U.S.C. §§ 901 *et seq.*; and (4) the Energy

Employees Occupational Illness Compensation Program Act ("EEOIC") (also known as the "Beryllium Exposure Compensation Act"), 42 U.S.C. §§ 7384 *et seq*.

25.     Together, the programs described above, and any other government-funded healthcare programs, are referred to as "Government Healthcare Programs" or "Government Insurance."

26.     A Government Healthcare Program may act as a primary payer or a "secondary payer," meaning that it will pay costs that the primary payer does not, including deductibles and copayments.

## SERVICES MUST BE MEDICALLY NECESSARY AND PERFORMED ECONOMICALLY

27.     Reimbursement practices under all Government Healthcare Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic reimbursement requirement under Medicare, Medicaid, and other Government Healthcare Programs is that the service or item provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (Medicare does not cover items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."); 5 U.S.C. § 8902(n)(1)(A) (FEHBP will not cover any treatment or surgery that is not medically necessary); 32 C.F.R. § 199.6(a)(5)(TRICARE provider has an obligation to provide services and supplies at only the appropriate level and "only when and to the extent

medically necessary."); 42 C.F.R. §§ 411.15(k)(1), 411.406; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme.") *United States v. Rutgard*, 116 F.3d 1270, 1275-76 (9th Cir. 1997) (holding that TRICARE and the Railroad Retirement Health Insurance Program follow the same rules and regulations as Medicare, citing, *e.g.*, 32 C.F.R. § 199.4(a)(1)(i)).

28.     Healthcare providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3) see also 32 C.F.R. § 199.6(a)(5) (TRICARE services and supplies must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care").

29.     These requirements prohibit defendants from manipulating billing procedures in "an intentionally wasteful manner" that maximizes their own economic benefit while providing no patient benefit. *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000).

Thus, "while there is no requirement that the least costly alternative treatment be used," requests for payment become false when they are the result of "policies to artificially (i.e., unreasonably and unnecessarily) increase the quantity of items and amount of services provided to their patients without regard to medical necessity." *United States ex rel. Vainer v. Davita, Inc.*, 2012 WL 12832381, at *6 (N.D. Ga. Mar. 2, 2012).

30.     Providers who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, regulations, and program instructions including without limitation the Anti-Kickback Statute and Stark Law. *See, e.g.*, Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

31.     Claims submitted by healthcare providers—including DME suppliers—to Government Healthcare Programs contain similar representations and certifications. *See, e.g.*, Forms CMS-1500 (paper provider claim form used for Medicare, Medicaid, TRICARE, FEHBP and OWCP); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for

Medicare and Medicaid); 837I (electronic version of form 1450). When submitting

a claim for payment, a provider does so subject to and under the terms of his

certification to the United States that the services were delivered in accordance

with federal law, including, for example, the relevant Government Healthcare

Program laws and regulations. Government Healthcare Programs require

compliance with these certifications as a material condition of payment, and

claims that violate these certifications are false or fraudulent claims under the

False Claims Act. CMS, its fiscal agents, and relevant State health agencies will

not pay claims for medically unnecessary services or claims for services provided

in violation of relevant state or federal laws.

## FACTUAL ALLEGATIONS

### Improper split/shared billing by providers in the hospital setting

32.    Generally, Government Insurance reimburses services performed by

midlevel providers (nurse practitioners and physician assistants) at a percentage

of the rates it reimburses for services performed by physicians. For example,

Medicare reimburses at 85% of the physician fee schedule, and Georgia Medicaid

reimburses at 90% of the physician fee schedule. Medicare Claims Processing

Manual, Ch. 12, §§ 110, 120A.

33.    Under Medicare, in a hospital setting, where both a midlevel provider and

a physician provide partial E/M services to a patient on the same day, the visit

may be billed under the physician for the full reimbursement rate as a "split/shared" visit. See Medicare Claims Processing Manual Ch. 12, § 30.6.1.

34.     Navicent abuses the split/shared rule in three ways: (1) submitting split/shared claims to Georgia Medicaid (which does not recognize the split/shared rule); (b) submitting split/shared claims for critical care services (which Medicare does not permit); and (c) submitting split/shared claims where the Navicent provider does not perform substantive services so as to qualify for billing under the rule.

***Billing Medicaid under a Non-Existent Split/Shared Rule***

35.     Georgia Medicaid does not permit split/shared billing.

36.     When a midlevel provider performs the E/M services in a hospital setting, the visit should be billed under the midlevel provider.

37.     However, when a physician and midlevel provider both provide part of E/M services to Medicaid beneficiaries, Navicent routinely submits false claims to Medicaid billing the entire service under the physician.

38.     These claims billed as split/shared are false because they certify that the physicians have rendered services that were rendered by a midlevel provider.

39.     These claims are material because Navicent is being paid 100% reimbursement, as if the service had been provided by a physician, instead of the

90% reimbursement Medicaid generally pays for services provided by midlevel providers.

*Billing Split/Shared for Critical Care Services*

40.    Medicare does not allow for split/shared billing to be applied to critical care services.

41.    If a midlevel provider performs critical care services, that time must be billed under the midlevel provider.

42.    Navicent routinely applies split/shared billing to critical care services.

43.    These claims billed as split/shared are false because they certify that the physicians have rendered critical care services that were rendered by a midlevel provider.

44.    These claims are material because they cause Government Insurance to reimburse at a higher rate than to which Navicent is entitled.

45.    Moreover, as discussed below, frequently the claims were false because the providers did not actually perform critical care services.

*Billing Split/Shared without Substantive Participation by the Billing Physician*

46.    For E/M to qualify as split/shared under Medicare guidelines, there must be a face-to-face encounter between the patient and the physician. Medicare Claims Processing Manual, Ch. 12 § 30.6.1.

47.    To qualify for split/shared billing, the physician must also perform one of the three substantive components of the E/M visit (history, examination, or medical decision making).

48.    An exam performed by a midlevel provider where a physician simply sticks his head in the doorway does not qualify for split/shared billing.

49.    If, for example, all the physician did was review the patient's medical records or sign off on the progress notes, then the encounter should be billed under the midlevel provider.

50.    At MCCG, in situations where the midlevel providers perform the actual service, the physicians routinely provide a boilerplate attestation statement indicating that they saw the patient in addition to reviewing and agreeing with the midlevel's work.

51.    For example, the midlevels frequently write "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with the Attending Physician," and the physicians then write "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider."

52.     This is a template designed by Navicent in an attempt to support billing the E/M service under the physician instead of the midlevel provider who performed the actual E/M.

53.     The physician may also duplicate information already attained and documented during the mid-level provider's examination.

54.     In those instances, the physician performs no substantive portion of an E/M visit.

55.     The physician cannot meet the documentation requirements of substantiating the medical necessity of the split/shared visit by simply repeating a portion of the E/M already performed by the midlevel provider.

56.     Navicent submitted false claims to Government Insurance under the pretense that the physician performed a substantive portion of the E/M that it did not actually perform.

57.     These claims billed as split/shared are false because they certify that the physicians have rendered services that they have not rendered.

58.     These claims are material because they cause Government Insurance to reimburse at a higher rate than to which Navicent is entitled.

***Navicent Knowingly Allows False Claims to be Submitted under the Split/Shared Rule***

59.     Beginning around September 2018, Relator educated management, coders, and physicians as to what services qualified (and did not qualify) and what

Government Insurance allowed (and did not allow) for split/shared billing, and what was required to document split/shared services.

60.    Relator requested a bill hold from September 2018 through November 2018 for approximately 800-1,000 claims to Medicare and Medicaid that she believed had been improperly coded.

61.    Relator met with the individual coders, explained to them why the billing was improper (or gave them the opportunity to explain why the billing should be allowed), and took the results back to Lori Cassidy.

62.    Ursula Lunce, Navicent Director of Physician Practices, directed Relator to release the claims.

63.    Navicent did not look for split/share issues in claims submitted prior to September 2018, and coders continued to submit these claims (now apparently with Navicent's blessing) after November 2018.

## Improper Billing of Critical Care Time

64.    Navicent bills critical care services when the documentation does not support the use of this code.

65.    CPT codes 99291 and 99292—Critical Care Time—are intended to reimburse providers for care provided in life-threatening situations. They require the patient to be both critically ill and for the treatment to reflect the critical nature.

66.     Medicare will only pay for services reported with CPT codes 99291 and 99292 when all the criteria for critical care and critical care services are met.

67.     Critical care is defined by Medicare as the direct delivery by a physician(s) medical care for a critically ill or critically injured patient. A critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient's condition.

68.     Critical care involves high complexity decision making to assess, manipulate, and support vital system functions(s) to treat single or multiple vital organ system failure and/or to prevent further life threatening deterioration of the patient's condition. Examples of vital organ system failure include, but are not limited to: central nervous system failure, circulatory failure, shock, renal, hepatic, metabolic, and/or respiratory failure. Although critical care typically requires interpretation of multiple physiologic parameters and/or application of advanced technology(s), critical care may be provided in life threatening situations when these elements are not present.

69.     Critical care services must be medically necessary and reasonable. Services provided that do not meet critical care services or services provided for a patient who is not critically ill or injured in accordance with the above definitions and criteria but who happens to be in a critical care, intensive care, or other

specialized care unit should be reported using another appropriate E/M code (e.g., subsequent hospital care, CPT codes 99231-99233).

70.     The duration of critical care services to be reported is the time the physician spent evaluating, providing care and managing the critically ill or injured patient's care. That time must be spent at the immediate bedside or elsewhere on the floor or unit so long as the physician is immediately available to the patient.

71.     For any given period of time spent providing critical care services, the physician must devote his or her full attention to the patient and, therefore, cannot provide services to any other patient during the same period of time.

72.     Relator routinely identified claims that Navicent submitted to Government Insurance for critical care services where patient documentation did not support medical necessity or the provision of critical care services.

73.     For example, Relator routinely reviewed billing data and patient records indicating that Navicent submitted claims to Government Insurance for critical care services for patients who were stable and awaiting transfer out of the ICU.

**Examples of False Claims for Split/Shared and/or Critical Care Services**

74.     The following are examples where Navicent submitted false claims to Government Insurance for split/shared and/or critical care services.

**Patient DC**

75.     On February 13, 2018, NP AHB[1] documented providing services for
Patient DC. Her notes indicate that "The patient's evaluation, management,
diagnosis, plan of care, and disposition have been discussed with the Attending
Physician," but made no other reference to services provided by a physician.

76.     Dr. JDP separately submitted an addendum to the NP's notes, stating
"Face to face contact occurred between the patient and myself. I agree with the
patient's evaluation, management, diagnosis, plan of care and final disposition
discussed with the Mid Level Provider," but did not describe any substantive
services that he had performed.

77.     Dr. JDP documented that 35 minutes of critical care had been provided to
Patient DC.

78.     The documentation did not support the performance of or billing for
critical care services. To the contrary, the NP's notes indicate that Patient DC was
stable and extubated and could be discharged soon.

79.     Although the documentation indicates that NP AHB provided the service,
and Dr. JDP merely reviewed the NP's work, on February 14, 2018, Navicent

---

[1] Provider and patient names are replaced with initials, even in quotes, to protect
their identities.

submitted a claim for Patient DC to Medicare Part B for CPT Code 99291 (critical care) for $449 under Dr. JDP's NPI.

80.     On March 7, 2018, Medicare paid Navicent $349.08 for this claim.

**Patient BC**

81.     On August 29, 2018, NP AHB documented providing services for Patient BC. Her notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with the Attending Physician," but made no other reference to services provided by a physician.

82.     Dr. AA separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with Ms. H-B," but did not describe any substantive services that he had performed.

83.     Dr. AA documented that 40 minutes of critical care had been provided to Patient BC.

84.     The documentation did not support the performance of or billing for critical care services.

85.     Although the documentation indicates that NP AHB provided the service, and Dr. AA merely reviewed the NP's work, on September 4, 2018, Navicent

submitted claim #S312782900101 for Patient BC to Medicaid for CPT Code 99291 for $449 under Dr. AA's NPI.

86.     Navicent also submitted claims to Medicaid for CPT Code 99291 eight additional times from August 27, 2018 through September 11, 2019.

87.     On September 11, 2018, Medicaid paid Navicent $641.97 for some of these claims.

88.     These claims were false because (a) the NP performed the substantive services and Medicaid does not recognize split/shared billing; (b) critical care services are not subject to split/shared billing; and (c) there was no documentation supporting billing for critical care services.

**Patient MD**

89.     On July 12, 2018, NP JKD documented providing services for Patient MD. Her notes indicate that "Assessment and plan was discussed with attending physician," but made no other reference to services provided by a physician.

90.     Dr. AA separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider," but did not describe any substantive services that he had performed.

91.    Dr. AA documented that 35 minutes of critical care had been provided to Patient MD, but his notes indicated that the patient was "doing well and may get extubated."

92.    On September 27, 2018, Navicent submitted a claim for Patient MD to Care Improvement Plus Medicare Advantage Plan for $1080 under Dr. AA's NPI, which included billing for critical care services on both July 11 and July 12, 2018.

93.    On October 18, 2018, the Medicare Advantage Plan paid Navicent $480.70 for this claim.

**Patient WD**

94.    On August 31, 2018, NP AHB documented providing services for Patient WD. Her notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with the Attending Physician," but made no other reference to services provided by a physician.

95.    Dr. AA separately submitted an addendum to the NP's notes, stating "The patient's evaluation, management, diagnosis, plan of care and disposition have been discussed and face to face contact occurred with Ms. HB, NP," but did not describe any substantive services that he had performed.

96.    Dr. AA documented that 35 minutes of critical care had been provided to Patient WD on August 31, 2018.

97.    Although the documentation indicates that NP AHB provided the service, and Dr. AA merely reviewed the NP's work, on September 24, 2018, Navicent submitted a claim for Patient WD to Medicare Part B for CPT Code 99291 for $449 under Dr. AA's NPI.

98.    Navicent billed Medicare under CPT Code 99291 eleven additional times (twice per day) from August 28, 2018 through September 2, 2018.

**Patient EF**

99.    On March 19, 2018, NP AHB documented providing services for Patient EF. Her notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with the Attending Physician," but made no other reference to services provided by a physician.

100.    Dr. JDP separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider," but did not describe any substantive services that he had performed.

101.    Dr. JDP documented that 40 minutes of critical care had been provided to Patient EF.

102.    The documentation did not support the performance of or billing for critical care services. To the contrary, the physician's notes indicated the patient's

issues were "Resolved. Stable"; there was "No emergent need for RRT"; and the patient was being transferred to the floor.

103.    Although the documentation indicates that NP AHB provided the service, and Dr. JDP merely reviewed the NP's work, on March 19, 2018, Navicent submitted a claim for Patient EF to Medicare for CPT Code 99291 for $449 under Dr. JDP's NPI.

104.    On April 9, 2018, Medicare paid Navicent $174.54 for this claim.

**Patient MG**

105.    On May 16, 2018, NP AHB documented providing services for Patient MG. Her notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with the Attending Physician," but made no other reference to services provided by a physician.

106.    Dr. JDP separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider," but did not describe any substantive services that he had performed.

107.    Dr. JDP documented that 40 minutes of critical care had been provided to Patient MG.

108.    The documentation did not support the performance of or billing for critical care services. To the contrary, the physician's notes indicated the patient was stable and had experienced no significant events overnight; the NP's notes indicated the "Patient is stable and will transfer to the floor today."

109.    Although the documentation indicates that NP AHB provided the service, and Dr. JDP merely reviewed the NP's work, on May 16, 2018, Navicent submitted a claim for Patient MG to Medicare for CPT Code 99291 for $449 under Dr. JDP's NPI.

110.    On June 14, 2018, Medicare paid Navicent $174.54 for this claim.

**Patient BH**

111.    On September 4, 2018, NP JKD documented providing services for Patient BH. Her notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with the Attending Physician," but made no other reference to services provided by a physician.

112.    Dr. JDP separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider," but did not describe any substantive services that he had performed.

113.    Dr. JDP documented that 30 minutes of critical care had been provided to Patient BH.

114.    The documentation did not support the performance of or billing for critical care services. To the contrary, the physician's notes and NP's notes indicated the patient was being transferred to the floor.

115.    Although the documentation indicates that NP JKD provided the service, and Dr. JDP merely reviewed the NP's work, on September 20, 2018, Navicent submitted a claim for Patient BH to Medicare Part B for CPT Code 99291 for $449 under Dr. JDP's NPI.

116.    On October 4, 2018, Medicare paid Navicent $231.26 for this claim.

**Patient RH**

117.    On May 5, 2018, NP JES documented providing services for Patient RH. His notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed and face to face contact occurred with Dr. MCS," but made no other reference to services provided by a physician.

118.    Dr. MCS separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider," but did not describe any substantive services that he had performed.

119.    Although the documentation indicates that NP JES provided the service, and Dr. MCS merely reviewed the NP's work, on May 8, 2018, Navicent submitted a claim for Patient RH to Medicaid for CPT Code 99233 for $175 under Dr. MCS's NPI.

120.    On May 22, 2018 Medicaid paid Navicent $125.09 for this claim.

**Patient BI**

121.    On June 20, 2018, NP AHB documented providing services for Patient BI. Her notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with Attending Physician," but made no other reference to services provided by a physician.

122.    Dr. JDP separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider," but did not describe any substantive services that he had performed.

123.    Dr. JDP documented that 40 minutes of critical care had been provided to Patient BI.

124.    The documentation did not support the performance of or billing for critical care services. To the contrary, the physician's notes and NP's notes indicated the patient was stable and being transferred to the floor.

125.    Although the documentation indicates that NP AHB provided the service, and Dr. JDP merely reviewed the NP's work, on June 28, 2018, Navicent submitted a claim to Medicare for Patient BI for CPT Code 99291 for $449 under Dr. JDP's NPI.

**Patient LL**

126.    On March 23, 2018, NP AHB documented providing services for Patient LL. Her notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with Attending Physician," but made no other reference to services provided by a physician.

127.    Dr. JDP separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider," but did not describe any substantive services that he had performed.

128.    Dr. JDP documented that 40 minutes of critical care had been provided to Patient LL.

129.    Although the documentation indicates that NP AHB provided the service, there was no acute distress noted, and Dr. JDP merely reviewed the NP's work, Navicent submitted a claim for Patient LL to Medicare for CPT Code 99291 for March 21, 22, and 23, 2018 for $449 each, totaling $1,347, under Dr. JDP's NPI.

130.    Medicare paid Navicent $523.62 for this claim.

131.    Patient LL had Medicaid as a secondary insurance, and so upon information and belief, Navicent billed Medicaid as well.

**Patient FM**

132.    On January 17, 2017, PA JAL documented providing services for Patient FM. He made no reference to services provided by a physician.

133.    Dr. JMA separately submitted an addendum to the PA's notes, stating "I saw and examined the patient and agree with the history, exam, assessment and recommendations as stated above."

134.    Although the documentation indicates that PA JAL provided the service and Dr. JMA merely reviewed the PA's work, on February 1, 2017, Navicent submitted a claim for Patient FM to Medicare Part B for $392, under Dr. JMA's NPI.

135.    Medicare paid Navicent $266.61 for this claim.

**Patient RN**

136.    On March 7, 2017, NP, TMM documented providing services for Patient RN. She made no reference to services provided by a physician.

137.    Dr. JMA separately submitted an addendum to the PA's notes, stating only "I saw and examined the patient and agree with the history, exam, assessment and recommendations as stated above."

138.    Although the documentation indicates that NP TMM provided the service and Dr. JMA merely reviewed the NP's work, on March 7, 2017, Navicent submitted a claim for Patient RN to the Aetna Medicare Advantage plan for $431, under Dr. JMA's NPI.

139.    Medicare Advantage paid Navicent $271.75 for this claim.

140.    On March 13, 2017, NP, TMM documented providing services for Patient RN. She made no reference to services provided by a physician.

141.    Dr. JMA separately submitted an addendum to the PA's notes, stating only "I saw and examined the patient and agree with the history, exam, assessment and recommendations as stated above."

142.    Although the documentation indicates that NP TMM provided the service and Dr. JMA merely reviewed the NP's work, on April 3, 2017, Navicent submitted a claim for Patient RN to Medicare Advantage for $206, under Dr. JMA's NPI.

143.    Medicare Advantage paid Navicent $139.46 for this claim.

144.    On March 15, 2017, NP TMM documented providing services for Patient RN. She made no reference to services provided by a physician.

145.    Dr. JMA separately submitted an addendum to the PA's notes, stating only "I saw and examined the patient and agree with the history, exam, assessment and recommendations as stated above."

146.    Although the documentation indicates that NP TMM provided the service and Dr. JMA merely reviewed the NP's work, on April 3, 2017, Navicent submitted a claim for Patient RN to Medicare Advantage for $207, under Dr. JMA's NPI.

147.    Medicare Advantage paid Navicent $113.94 for this claim.

148.    On March 23, 2017, NP, TMM documented providing services for Patient RN. She made no reference to services provided by a physician.

149.    Dr. JMA separately submitted an addendum to the PA's notes, stating only "I saw and examined the patient and agree with the history, exam, assessment and recommendations as stated above."

150.    Although the documentation indicates that NP TMM provided the service and Dr. JMA merely reviewed the NP's work, on April 3, 2017, Navicent submitted a claim for Patient RN to Medicare Advantage for $207, under Dr. JMA's NPI.

151.    Medicare Advantage paid Navicent $113.94 for this claim.

**Patient BP**

152.    On September 13, 2018, NP JES documented providing services for Patient BP. His notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed and face to face contact

occurred with Dr. MCS," but made no other reference to services provided by a physician.

153.   Dr. MCS separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider."

154.   Dr. MCS documented that 32 minutes of critical care had been provided to Patient BP.

155.   The documentation did not support the performance of or billing for critical care services. To the contrary, the NP's notes stated there had been no acute overnight events, and "[t]he patient states she feels much better and was able to ambulate with PT today. She denies headache, diarrhea, nausea, vomiting, chest pain and shortness of breath. She reports some continued weakenss [sic], however, states this has significantly improved. No other complaitns [sic] voiced at this time."

156.   Although the documentation indicates that NP JES provided the service, and Dr. MCS merely reviewed the NP's work, on September 18, 2018, Navicent submitted a claim for Patient BP to Medicare Part B for CPT Code 99291 for $449 under Dr. MCS's NPI.

157.    Although Patient BP's condition had improved, Navicent submitted claims to Medicare Part B for CPT Code 99291 for critical care services allegedly rendered on September 14 and 15, 2018 as well.

**Patient SS**

158.    On November 12, 2018, NP KLM documented providing services for Patient SS. Her notes indicate that "The patient's evaluation, management, diagnosis, plan of care, and disposition have been discussed with the Attending Physician," but made no other reference to services provided by a physician.

159.    Dr. JDP separately submitted an addendum to the NP's notes, stating "Face to face contact occurred between the patient and myself. I agree with the patient's evaluation, management, diagnosis, plan of care and final disposition discussed with the Mid Level Provider," but did not describe any substantive services that he had performed.

160.    Dr. JDP documented that 30 minutes of critical care had been provided to Patient SS.

161.    The documentation did not support the performance of or billing for critical care services. To the contrary, the physician's notes and NP's notes indicated the patient's condition had improved and she was awake and following commands and was being transferred to the floor.

162.    Although the documentation indicates that NP KLM provided the service and Dr. JDP merely reviewed the NP's work, on December 4, 2018, Navicent submitted a claim for Patient SS to Medicare Part B for CPT Code 99291 for $449 under Dr. JDP's NPI.

163.    On December 20, 2018, Medicare paid Navicent $174.54 for this claim.

**Upcoding of evaluation/management visits resulting from generic templates in lieu of specific patient documentation**

164.    Generally, when a healthcare provider sees a patient, they should record their specific findings and assessment in that patient's healthcare records.

165.    If a healthcare provider uses a template for a certain type of visit, they are still expected to document the specific information related to that patient's visit on the date of service ("DOS"), such as the chief complaint, history of the present illness, review of symptoms, physical exam, and assessment/plan.

166.    Navicent's EHR software includes customizable templates for provider notes.

167.    However, at least two groups affiliated with Navicent—the Navicent Health Urgent Care practice ("Urgent Care") and Central Georgia Family Medicine ("CGFM")—are abusing the use of templates in three main ways: (1) by billing all patients at CPT codes warranting moderate to high severity, regardless of what the medical records and/or template shows (upcoded E/M), (2) by not changing the medical record templates from patient to patient (cloned notes),

and (3) by not changing the templates from each DOS the patient is seen and thus leaving diagnosis codes for prior visits (template abuse), each of which causes Medicare to be billed at a higher level than is warranted for the services actually rendered.

168.    Cloned notes and templates that do not accurately reflect what services were provided constitute false records material to false or fraudulent claims, i.e., claims submitted to Government Insurance for those services.

169.    Navicent knows this to be an issue with certain of its providers, including Urgent Care and CGFM, but has opted not to correct it or the billing.

170.    Appropriate medical billing relies on the billing physician to exercise medical judgment to determine the scope of what is medically necessary and reasonable. The CPT Manual explains that which code should be billed depends on the seriousness and complexity of the condition and the extent to which a patient is examined. The CPT Manual also explains in detail how these factors determine which code is appropriate.

171.    Cloned notes are notes that have little or no change from visit to visit and patient to patient, which often occurs in tandem with the abuse of templated medical records. These types of notes do not support the medical necessity of a visit. More importantly, in some cases, they may not actually support that a visit

occurred. Cloned notes may be construed as an attempt to defraud Medicare or Medicaid.

172.   Whether the documentation was the result of an Electronic Health Record, or the use of a pre-printed template, or handwritten cloned documentation, it is considered a misrepresentation of the medical necessity requirement for coverage of services due to the lack of specified individual information for each unique patient. Identification of this type of documentation should lead to denials of services and recoupment of all overpayments made.

173.   Generally, the Navicent providers at the various outpatient practices select and document billing codes. Each Navicent practice also has its own coders, who report to their respective practice manager, who are responsible for validating the CPT and ICD-10 codes entered by the providers.

174.   Most practices then send the claims to Physician Billing and Support Services (PBSS), which submits the claims to Government Insurance. PBSS employs two coders who review certain claims that are flagged by the system (such as an established patient coded as a new patient).

175.   Urgent Care and some inpatient billing is handled by a third-party biller instead of PBSS.

176.   Relator, as Coding Integrity Manager for the Physicians' Group, was responsible for educating each of the practices about coding compliance. Relator

would occasionally audit the practices' billing when requested and discuss coding errors with the individual practices.

177.   Relator had the authority to recommend temporary holds on questionable claims that were at risk for incorrect coding, documentation, and/or billing. But she did not ultimately have authority to keep Navicent from submitting them for reimbursement or to reverse improper claims.

178.   Moreover, through at least the end of Relator's employment, Navicent did not even have a process in place for reversing erroneous or unsupported claims.

179.   Relator provided Navicent management with examples of erroneous and unsupported claims that she believed needed to be reversed but, upon information and belief, Navicent never reversed the claims.

*Urgent Care*

180.   In August 2018, Relator was asked to review outpatient E/M billing for certain providers because their bonuses had skyrocketed with a noticeable uptick in RVUs.

181.   Relator quickly discovered that this was the result of documentation "templates" that had been introduced as part of the new EHR system.

182.   These templates were all designed to support a Level 4 or 5 visit. Thus, even when a visit only took a few minutes and required minimal effort on the

part of the physician, the notes reflected a much lengthier and more complex examination, and thus it was coded as such.

183.   Relator quickly realized that the templates not only were misleading as to the extent that services were performed during the visit, but they oftentimes failed to reflect—and sometimes contradicted—the actual substance of the visit. For example, she would see patients whose chief complaint was a sore throat, but the notes would say nothing about a sore throat.

184.   In some instances, providers opted for more generic notes, or if a template did not exist for a certain problem, they would find the "closest" template. Either method failed to adequately document the patient's concerns and the care that was provided.

185.   The result as to billing was always the same, however—nearly every visit was billed as a Level 4 or 5 due to the perceived extent of the visit.

186.   Relator's review also found the same notes appearing over and over again for different patients, i.e., cloned notes.

187.   In October or November 2018, Relator had meetings with Navicent management, the Director of Urgent Care Facilities, the director of Urgent Care's third-party biller, and lead physicians from Urgent Care to discuss the upcoding of E/M services.

188.    During one meeting, one of the Urgent Care physicians, who had created the practice templates, agreed that the templated information in the patients' medical records were (1) not being changed from visit to visit and (2) not supportive of the level 4 and 5 CPT billing rates assigned to each DOS.

189.    In other words, these were cloned notes resulting in upcoding of E/M services.

190.    To Relator's knowledge, there was never a complete audit and recoupment done to repay the upcoded claims.

191.    To Relator's knowledge, Urgent Care has not corrected this practice of coding E/M visits to match the cloned notes.

### *Patient Examples of Template Upcoding at Urgent Care*

**<u>Patient DD</u>**

192.    Patient DD was seen by Dr. Sugarman on June 20, 2018. The documented complaint was for "chest tightness when arguing, none currently." The history of his present illness notated in his medical record stated he presents with chest pain and had a history of panic attacks.

193.    The documented "review of systems" and "physical exam" contain conflicting indications compared to the assessment/plan regarding chest pain and anxiety. For example, the physical exam—which was based off the template—includes symptoms such as "regular rate and rhythm" under

cardiovascular and "no tenderness" under chest wall, yet the review of symptoms clearly states that the patient was experiencing chest pain.

194.    Furthermore, under "plan" it states that the patient's condition is stable, yet he was being transitioned to EC Navicent Medical Center for further evaluation of chest pain.

195.    Urgent Care submitted a claim for $253.00 to Medicaid for reimbursement on June 24, 2018, for CPT code 99215.

196.    Given the assessment/plan ordered by Dr. Sugarman, the medical decision-making lacks the complexity required to support a CPT code of 99215.

197.    Additionally, the history of present illness, chief complaint, review of symptoms, and physical exam sections are contradictory and do not support the assessment/plan ordered by the doctor—indicating template abuse or cloning.

**Patient RM**

198.    History of present illness is supposed to be a chronological description by the patient of the development of the patient's present illness from first sign and/or symptom or the from the previous encounter to the present.

199.    As this varies by patient, a history of present illness is not suitable for being part of a template.

200.    However, history of present illness was often a part of the Urgent Care templates.

201.   For example, Patient RM was seen by Dr. Dedea on June 17, 2018. The documented complaint was for fatigue and weakness. The history of her present illness notated in her medical record was problem focused instead of actual treatment or complaint history of the patient.

202.   Urgent Care submitted a claim for $253.00 to Medicare Adv. UHC for reimbursement on June 22, 2018 for CPT code 99215.

203.   Given the assessment/plan ordered by Dr. Dedea (fatigue, which was a new problem with no acute symptoms), the medical decision-making lacks the complexity required to support a CPT code of 99215.

**<u>Patient JH</u>**

204.   Patient JH was seen by Leon on May 15, 2018. The documented complaint was: "Mother reports patient has bite to left lower leg with redness from last night. Patient reports he has been feeling weak and throat has felt swollen since this am." The history of his present illness notated in his medical record was problem focused instead of actual treatment or complaint history of the patient.

205.   Urgent Care submitted a claim for $173.00 to Peach State for reimbursement on May 21, 2018, for CPT code 99214.

206.   Given the assessment/plan ordered by Dr. Leon (complaint of insect bite and allergic urticaria, but stable and discharged), the medical decision-making lacks the complexity required to support a CPT code of 99214.

**Patient TT**

207.    Patient TT was seen by Dr. Longaker on May 21, 2018. The documented complaint was for a patient visit seen for a recheck of kidney stones. The history of his present illness notated in his medical record noted severe pain 9/10 and achy. However, the review of symptoms states under GI, "no abdominal pain."

208.    Urgent Care submitted a claim for $173.00 to BlueCross Health Exc. for reimbursement on May 25, 2018, for CPT code 99214.

209.    Given the assessment/plan ordered by Dr. Longaker (follow up from a resolved condition), the medical decision-making lacks the complexity required to support a CPT code of 99214.

210.    Additionally, there is inappropriate utilization of a template where the initial documentation from the history of present illness was simply copied and pasted into this new record—which indicates template abuse or cloning.

*CGFM*

211.    A Navicent Quality Manager alerted Relator that the providers at CGFM were using cloned notes, i.e., the same templates from patient-to-patient and over-utilizing Level 4 and 5 E/M codes with insufficient supporting documentation. She gave Relator examples of patients with multiple dates of service with little-to-no change in their documentation.

212.    Relator then found several medical records that did not support the level of billing that had been coded by CGFM due to either cloned notes and/or template abuse.

213.    Based on these medical records and the coinciding claims subsequently submitted to Government Insurance for payment, Relator concluded that CGFM was either not changing the medical record templates from patient to patient (cloned notes) or not changing the templates from each date of service a patient was seen, thus leaving diagnosis codes for prior visits (template abuse).

214.    Additionally, there were some medical records (even if incorrectly cloned or templated) that did not support the billing of a level 4 or 5 visit.

215.    To Relator's knowledge, CGFM has not changed its documentation or billing practices.

### *Patient Examples of Template Upcoding at CGFM*

**<u>Patient SL</u>**

216.    Patient SL was seen by Dr. Taunton Jr. on March 18, 2019. The documented complaint was "low back pain that radiates down back of left leg… arthritis pain in knees." The history of her present illness notated in her medical record was lower back pain and complaints of a cough/cold/runny nose.

217.    Notwithstanding the limited and standard complaint of a cold and back pain, the documentation includes an extensive review of 12 systems, including

gastrointestinal, endocrine, and breasts, simply to note that there were no findings.

218.   The documented "review of systems" and "physical exam" contain conflicting indications. For example, the system review—which was based off the template—includes unrelated symptoms such as "headache, sinus pain/pressure," while noting "no cough or wheezing" and "no localized joint pain." The review of symptoms also notes "nasal discharge" but the physical exam notes indicate "no nasal discharge seen."

219.   CRMG submitted a claim to Medicare for reimbursement on March 24, 2019, for CPT codes 99215, 96372, J1040, J1100. Given the assessment/plan ordered by Dr. Taunton Jr. (low back pain, cough, acute sinusitis, and rhinitis), the treatment lacks the high complexity required to support a CPT code of 99215. Additionally, the history of present illness, review of symptoms, and physical exam sections are contradictory and do not support the assessment/plan ordered by the doctor—indicating template abuse or cloning.

220.   Medicare remitted payment for this claim on or about April 8, 2019, in the amount of $134.15.

**Patient KS**

221.   Patient KS was seen by Dr. Taunton Jr. on September 18, 2018. The documented complaint was black heads in her left ear and mild low back pain

for several years. The history of her present illness notated in her medical record was lower back pain and complaints of red puss draining pimple in left ear.

222.   Notwithstanding the limited and standard complaint of cellulitis and back pain, the documentation includes an extensive review of 12 systems, including gastrointestinal, endocrine, and neurologic, simply to note that there were no findings.

223.   The documented "review of systems" and "physical exam" contain conflicting indications. For example, the system review—which was based off the template—includes symptoms such as "no ear pain" and "no joint pain." The physical exam notes indicate "indurate puss draining lesion in left auricle."

224.   CRMG submitted a claim to Medicaid for reimbursement on February 6, 2019, for CPT codes 99215. Given the assessment/plan ordered by Dr. Taunton Jr. (low back pain, ordering of x-ray, and cellulitis), the treatment lacks the high complexity required to support a CPT code of 99215. Additionally, the history of present illness, review of symptoms, and physical exam sections are contradictory and do not support the assessment/plan ordered by the doctor— indicating template abuse or cloning.

225.   Medicaid remitted payment for this claim on or about February 12, 2019, in the amount of $226.00.

**Patient DC**

226.    Patient DC was seen by Dr. Taunton Jr. on July 31, 2018. The documented complaint was for a "med refill and discuss some things; due for colonoscopy." The history of his present illness notated in her medical record was for a physical exam and labs to be reviewed from an outside source.

227.    The documented "review of systems" and "physical exam" contain conflicting indications compared to the assessment/plan regarding high cholesterol, diabetes, and hypertension. For example, the system review—which was based off the template—includes symptoms such as "no excessive thirst, no polyuria, no cold intolerance, no heat intolerance, no excessive hunger," under endocrine yet the patient has been diagnoses previously with diabetes and high cholesterol. The review of symptoms and physical exam also do not indicate any symptoms for hypertension, but the patient was previously diagnosed with hypertension according to the assessment/plan.

228.    CRMG submitted a claim to Medicare for reimbursement on August 28, 2018, for CPT code 99215. Given the assessment/plan ordered by Dr. Taunton Jr. (high cholesterol, diabetes, and hypertension), the treatment lacks the high complexity required to support a CPT code of 99215. Additionally, the history of present illness, review of symptoms, and physical exam sections are

contradictory and do not support the assessment/plan ordered by the doctor—

indicating template abuse or cloning.

229.    Medicare remitted payment for this claim in the amount of $226.00.

**Patient DD**

230.    Patient DD was seen by Dr. Taunton Jr. on July 9, 2018. The documented

complaint was for a three month follow up and labs. The history of her present

illness notated in her medical record was for a physical exam, which was

problem focused instead of actual treatment or complaint history of the patient.

231.    The documented "review of systems" and "physical exam" contain

conflicting indications compared to the assessment/plan regarding COPD and

hypertension. For example, the system review—which was based off the

template—includes symptoms such as "no shortness of breath, no cough, no

sputum production, no wheezing, no cyanosis, no apnea," under respiratory yet

the patient has been diagnoses previously with COPD. The review of symptoms

and physical exam also do not indicate any symptoms for hypertension, but the

patient was previously diagnosed with hypertension according to the

assessment/plan.

232.    CRMG submitted a claim to Medicare for reimbursement on August 8,

2018, for CPT code 99215. Given the assessment/plan ordered by Dr. Taunton Jr.

(COPD, hypertension, and examination), the treatment lacks the high complexity

required to support a CPT code of 99215. Additionally, the history of present illness, review of symptoms, and physical exam sections are contradictory and do not support the assessment/plan ordered by the doctor—indicating template abuse or cloning.

233.   Medicare remitted payment for this claim on or about August 23, 2018, in the amount of $226.00.

**Patient EG**

234.   Patient EG was seen by Dr. Taunton Jr. on October 29, 2018. The documented complaint was for lab work. The history of his present illness notated in his medical record was for a physical exam, which was problem focused instead of actual treatment or complaint history of the patient.

235.   CRMG submitted a claim to Medicare for reimbursement on November 21, 2018, for CPT codes 99215, 90686, and G0008. Given the assessment/plan ordered by Dr. Taunton Jr. (examination), the treatment lacks the high complexity required to support a CPT code of 99215.

236.   Medicare remitted payment for this claim on or about December 6, 2018, in the amount of $286.00.

*Training*

237.   As Coding Integrity Manager, Relator trained the practice coders on coding compliance and raised the issue regarding the misuse of templates to them on multiple occasions.

238.   She gave a presentation to Urgent Care on November 13, 2018 addressing her concerns with the templates resulting in incorrect documentation and upcoding E/M visits.

239.   She requested permission to give this same presentation to CRMG, but Navicent management refused to let her do so.

240.   On November 28, 2018, during a training presentation to the Navicent providers, one provider expressed his understanding that as long as the patient records included 2 of 3 categories of documentation (Comprehensive History, Comprehensive Exam, and/or High Complexity Medical Decision-Making) for an established patient, they were permitted to code the visit as a Level 5, and that the template essentially automatically provided documentation of a comprehensive history and comprehensive exam that would allow high level billing.

241.   Relator explained that the volume of documentation should not be the primary factor in selecting a specific level of service, per CMS; rather, the

severity of the patient/medical necessity should be the basis for billing a particular E/M code.

242.   Ursula Lunce, Navicent Director of Physician Practices, interjected and told the room of providers that Relator was wrong.

243.   Relator had another conversation with this same doctor and his coder and provided him with relevant sections of the Medicare Claims Processing Manual that supported her interpretation of proper billing for E/M services.

244.   The provider expressed concerns that he could not alter certain aspects of the template, such as the patient history, and he felt this was problematic because the E/M codes were based in part on the comprehensive patient history.

### Missing or fabricated documentation to support E/M services

245.   In a meeting with a Navicent provider in or about July 2018, Relator learned that the provider had hundreds of patient visits with incomplete documentation and for which no claims had been submitted, dating back many months.

246.   Upon learning of the undocumented visits, in August 2018, Navicent requested that the provider complete charts for those patient visits, which dated back to January and February 2018.

247.   Relator objected to this, as the provider could not possibly remember the particulars of those visits so many months later.

248.    Relator also saw instances where providers added a -25 modifier in order to get E/M claims paid in conjunction with procedure codes, when there was no documentation of a significant, separately identifiable evaluation and management (E/M) service by the same physician on the same day of the procedure or other service.

**<u>COUNT I</u>**
**VIOLATIONS OF 31 U.S.C. § 3729 – FEDERAL FCA**
**(All Defendants)**

249.    Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

250.    As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

251.    As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

252.    As set forth above, Defendants, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit

money or property to the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

253.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. 31 U.S.C. § 3729.

254.   Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## COUNT II
## VIOLATIONS OF O.C.G.A. § 49-4-168.1 – GEORGIA FALSE MEDICAID CLAIMS ACT
### (All Defendants)

255.   Relator hereby incorporates and realleges all other paragraphs as if fully set forth herein.

256.   As set forth above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1).

257.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of O.C.G.A. § 49-4-168.1(a)(2).

258.   Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. O.C.G.A. § 49-4-168.1.

259.   Relator is entitled to reasonable attorneys' fees, costs, and expenses

pursuant to O.C.G.A. § 49-4-168.2(i).

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants:

(a) awarding the United States treble damages sustained by it for each of

the false claims;

(b) awarding the United States a maximum civil penalty for each of the

false claims and statements;

(c) awarding the State of Georgia treble damages sustained by it for each

of the false claims

(d) awarding the State of Georgia the maximum civil penalty for each of

the false claims and records;

(e) awarding Relator thirty percent (30%) of the proceeds of this action

and any alternate remedy or the settlement of any such claim;

(f) awarding Relator litigation costs and reasonable attorneys' fees; and

(g) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and

counts triable as of right before a jury.

Respectfully submitted,

Julie Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com